## 23-4693

# United States Court of Appeals

### *for the*

# Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

– v. –

ARBAB SALEEM,

*Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

# BRIEF OF APPELLANT

William R. Terpening
TERPENING LAW, PLLC
221 West 11th Street
Charlotte, North Carolina 28202
(980) 265-1700

*Counsel for Appellant*



CP COUNSEL PRESS      (800) 4-APPEAL • (JOB 810033)

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................. ii

JURISDICTIONAL STATEMENT ...................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................ 1

STATEMENT OF THE CASE ............................................................. 1

SUMMARY OF THE ARGUMENT .................................................... 8

ARGUMENT ...................................................................................... 11

I.    THE DISTRICT COURT ERRED BY CONCLUDING
      THAT THE GOVERNMENT MET ITS BURDEN OF
      SHOWING THAT THE SECOND AMENDMENT DID
      NOT PROTECT SALEEM ........................................................ 11

      A.    Standard of Review ....................................................... 11

      B.    Argument ........................................................................ 11

            1.    The Law ................................................................ 11

            2.    There is No Regulation in the 1791-era
                  Historical Tradition Analogous to the National
                  Firearms Act ........................................................ 17

            3.    The Short-Barreled Shotgun is an "Arm"
                  Falling Under Second Amendment Protection,
                  and There is No Analogous Historical Tradition
                  of Regulations Requiring its Registration ........... 18

            4.    The Silencer is an "Arm" covered by the Second
                  Amendment and there is no Analogous
                  Historical Tradition of Regulations Requiring
                  Registration of Silencers .................................... 22

            5.    The Convictions Should be Vacated Because of
                  the Rule of Lenity ................................................ 27

CONCLUSION .................................................................................. 29

REQUEST FOR ORAL ARGUMENT ............................................... 29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Atkinson v. Garland,*
   70 F.4th 1018 (7th Cir. 2023) ............................................................ 15

*Caetano v. Massachusetts,*
   577 U.S. 411 (2016) ............................................................................ 20

*Cheek v. United States,*
   498 U.S. 192 (1991) ............................................................................ 28

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ................................................................... *passim*

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) .............................................................. 24

*Gompers v. United States,*
   233 U.S. 604 (1914) ............................................................................ 13

*Konigsberg v. State Bar of Cal.,*
   366 U.S. 36 (1961) .............................................................................. 13

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ........................................................... 12, 14, 15, 16

*New York State Rifle & Pistol Association, Inc. v. Bruen.,*
   597 U.S. 1 (2022) ...................................................................... *passim*

*United States v. Ancient Coin Collectors Guild,*
   899 F.3d 295 (4th Cir. 2018) .............................................................. 11

*United States v. Dinkins,*
   691 F.3d 358 (4th Cir. 2012) .............................................................. 11

*United States v. Good,*
   326 F.3d 589 (4th Cir. 2003) .............................................................. 11

*United States v. Miller,*
   307 U.S. 174)(1939) ............................................................. 13, 18, 24

*United States v. Price,*
   635 F. Supp. 3d 455 (S.D.W. Va. Oct. 12, 2022) ............................ 5, 17

*United States v. Soriano-Jarquin,*
    492 F.3d 495 (4th Cir. 2007)...................................................... 11

*United States v. Thompson/Ctr. Arms Co.,*
    504 U.S. 505 (1992) ........................................................... 27, 28

## Statutes & Other Authorities:

U.S. Const. amend. II ............................................................. *passim*

18 U.S.C. § 921(a)(3)............................................................... 23

18 U.S.C. § 921(a)(3)(A)............................................................. 4

18 U.S.C. § 921(a)(3)(B)............................................................. 4

18 U.S.C. § 921(a)(3)(C)........................................................... 3, 4

18 U.S.C. § 921(a)(6)............................................................. 3, 4

18 U.S.C. § 921(a)(24)............................................................ 3, 4

18 U.S.C. § 3231.................................................................... 1

26 U.S.C. § 5801................................................................... 17

26 U.S.C. § 5841................................................................... 17

26 U.S.C. § 5845(a).................................................................. 6

26 U.S.C. § 5845(a)(2)............................................................... 4

26 U.S.C. § 5845(a)(5)............................................................... 4

26 U.S.C. § 5845(a)(7)......................................................... 3, 4, 23

26 U.S.C. § 5845(e).................................................................. 4

26 U.S.C. § 5861(d)........................................................... 4, 6, 23

26 U.S.C. § 5861(g).................................................................. 4

26 U.S.C. § 5871.................................................................... 4

28 U.S.C. § 1291.................................................................... 1

U.S.S.G. § 2K2.1(b)(1)(A) ....................................................... 6, 7

U.S.S.G. § 2K2.1(b)(3)(B) .......................................................... 7

U.S.S.G. § 2K2.1(b)(6)(B) ...............................................................6, 7

U.S.S.G. § 3E1.1(a) ............................................................................6

U.S.S.G. § 3E1.1(b) ............................................................................6

1 *Dictionary of the English Language* 106 (4th ed.).............................23

1 *A New and Complete Law Dictionary* ............................................23

4 Blackstone 148–149 (1769) .............................................................19

*Blunderbuss, the "Thunder Box" of the Battlefield,* The
    American Revolution Institute of The Society of the
    Cincinnati,
    https://www.americanrevolutioninstitute.org/recent-
    acquisitions/english-blunderbuss/ (last accessed Mar. 9, 2024) .........21

C. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741
    (1993) .........................................................................................16

David B. Kopel & Joseph G.S. Greenlee, *The Second
    Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495
    (2019) .........................................................................................24

Emily Rupertus, *Suppressors: The History*, NRA Blog (Oct. 5,
    2016), https://www.nrablog.com/articles/2016/10/history-of-
    suppressors/................................................................................26, 27

James A. D'Cruz, *Half-Cocked: The Regulatory Framework of
    Short-Barrel Firearms*, 40 HARV. J.L. & PUB. POL'Y 493 (2017) .........19

N. Webster*, American Dictionary of the English Language*
    (1828) .........................................................................................23

Sportsmen's Heritage and Recreational Enhancement Act,
    H.R. 3668, 115th Cong., 1st Sess, Title XV – Hearing
    Protection, §§ 1501-07.................................................................25

*Firearms Commerce in the United States, Annual Statistical
    Update 2017*, United States Department of Justice, Bureau of
    Alcohol, Tobacco, Firearms and Explosives,
    https://www.atf.gov/resource-center/docs/undefined/firearms-
    commerce-united-states-annual-statistical-update-
    2017/download (last accessed Mar. 10, 2024) .........................20, 21, 27

iv

## JURISDICTIONAL STATEMENT

The district court had jurisdiction because this case was prosecuted as an offense against the laws of the United States, over which federal courts have jurisdiction. 18 U.S.C. § 3231. (JA11-13). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. Judgement was entered on October 19, 2023 (JA451-56) and Saleem filed a timely Notice of Appeal on November 1, 2023. (JA457). This appeal is from a final judgment.

## ISSUES PRESENTED FOR REVIEW

I.     Whether the district court erred in not dismissing the Indictment, although both arms at issue fell within the scope of Second Amendment protection and the Nation's historical tradition of firearm regulation did not include regulations criminalizing Saleem's failure to register a homemade shotgun and silencer made as part of his hobby.

## STATEMENT OF THE CASE

On April 6, 2020, Saleem was drawn into a violent domestic dispute with his longtime girlfriend, Shakena Golden. (JA547). The police responded. (JA547). Saleem allegedly told them that the couple drank alcohol, and then Golden became aggressive during an ensuing argument

1

and stabbed him in the left shoulder with a knife. (JA547). Saleem discharged a firearm into the floor to scare her away from attacking him. (JA199-200, JA547). In court filings, he explained that he "fir[ed] the gun into the floor in self-defense simply to get her to come to her senses and stop trying to kill him…." (JA199-200). Police reports describe the gun as "a revolver that belonged to [Golden's] grandfather." (JA547). Saleem was initially arrested, taken from the scene, and charged with assault by strangulation, discharging a firearm to incite fear, and assault on a female. (JA468). These state charges were dismissed six months later.[1] (JA468, JA601).

At the time of the domestic incident, police searched Saleem's home and car. (JA547-548). They found the revolver when they searched Saleem's BMW after he was taken into custody. (JA547-548). They also found one of the two firearms that are at the center of this appeal: a silencer, in a cardboard box on the car's back seat. (JA593). The government concluded that the silencer "is a firearm silencer as defined

---

[1] And Golden, his longtime girlfriend and the putative state court "victim," recanted her allegations and became his ardent supporter at the federal sentencing for possession of unregistered firearms, submitting a thorough and heartfelt letter of support. (JA55-57).

2

in 18 U.S.C. § 921(a)(24). It is a firearm as defined in 18 U.S.C. § 921(a)(3)(C)," and that "as a firearm silencer, it is also a 'firearm' as defined in 26 U.S.C. § 5845(a)(7)." (JA595).

Searching Saleem's home, police found the other item at the center of this appeal: a Stevens, Model 94, 16 gauge shotgun with a barrel and stock that authorities believe were cut. (JA592-594). According to government testing, the overall length of the shotgun was 19 ¾ inches, with a 13-inch barrel. (JA594). The government asserted that the shotgun was a firearm that met "the definition of a weapon made front a shotgun as defined by 18 U.S.C. § 921(a)(6), having an overall length of less than 26 inches and a barrel length of less than 18 inches." (JA594).

Neither the silencer nor the shotgun were registered to Saleem in the National Firearms Registration and Transfer Record. (JA592).

About two weeks later, authorities interviewed Saleem. (JA593). According to the government's account of the interview, Saleem said he made the silencer and shotgun himself using kits ordered from the internet. (JA954). Authorities reported that he began making homemade firearms as a hobby because he was unable to purchase gun permits from the Mecklenburg County Sheriff's Office because of unpaid traffic tickets.

3

(JA594). Saleem is not a felon, and barely has any criminal history at all. (JA603-604). He received a criminal history point each for two driving while impaired incidents in 2010 and 2013, respectively. (JA603-604). He allegedly said that he shortened the shotgun because he "thought it would look cool." (JA594).

Saleem was federally indicted on March 17, 2021, about a year after the incident. (JA11-12). All arising from that April 2020 incident, he was charged with possession of a firearm not registered in the National Firearms Registration and Transfer Record in connection with the Stevens short-barreled shotgun, in violation of 18 U.S.C. § 921(a)(6) and 26 U.S.C. §§ 5845(a)(2), 5861(g), and 5871 (Count One); the silencer, in violation of 18 U.S.C. §§ 921(a)(3)(C) and (a)(24) and 26 U.S.C. §§ 5845(a)(7), 5861(d), and 5871 (Count Two); and an "AR-15 type .223 Remington caliber firearm," in violation of 18 U.S.C. §§ 921(a)(3)(A) and (a)(3)(B) and 26 U.S.C. §§ 5845(a)(5) and (e), 5861(d), and 5871 (Count Three). (JA11-12). The grand jury found probable cause to forfeit the three firearms. (JA12).

On October 22, 2021, Saleem entered a "straight up" guilty plea, without a plea agreement, to Counts One and Two – the short-barreled

4

shotgun and the silencer, respectively. (JA33-54). The government did not pursue Count Three and indicated it would dismiss the Count, although that was not a condition of the plea. (JA43-44, JA169).

On June 23, 2022, the United States Supreme Court handed down its decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*. 597 U.S. 1 (2022). *Bruen*, as will be discussed below, clarified the framework for determining whether a person's conduct was subject to the protections of the Second Amendment to the United States Constitution. U.S. Const. amend. II. In response, on October 17, 2022 – and before he was sentenced – Saleem filed a Motion to Dismiss the Indictment. (JA76-85), which he supplemented after *United States v. Price* became the first court to consider analogous regulations after *Bruen*. 635 F. Supp. 3d 455 (S.D.W. Va. Oct. 12, 2022), *appeal pending*, No. 22-4609. (JA86-88). Judge Whitney conducted a lengthy hearing on the Motion to Dismiss on January 9, 2023. (JA97-167). As a threshold matter, he concluded that the Motion was timely – notwithstanding that it followed the guilty plea – because of the significant impact and importance of the Supreme Court's intervening opinion in *Bruen*. (JA172). On March 2, 2023, Judge Whitney entered an order denying the Motion to Dismiss. (JA168-190).

5

The case proceeded to sentencing – many details of which are not pertinent to this appeal, which focuses exclusively on the trial court's errors in applying *Bruen* and the Second Amendment. The final Presentence Investigation Report ("PSR") was entered on January 21, 2022. (JA589-616). Probation proposed a total offense level of 21, arising from a Base Offense Level of 18 ("The guideline for a violation of 26 U.S.C. § 5861(d) is found in USSG §2K2…[, t]he offense involved a firearm described in 26 U.S.C. § 5845(a)."), and enhancements for involvement of 3-7 firearms (U.S.S.G. § 2K2.1(b)(1)(A)(2 points), possession of a firearm in association with another offense ("namely" the dismissed state charge for "Assault by Strangulation," under U.S.S.G. § 2K2.1(b)(6)(B))(4 points), and a 3 point reduction for acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a) and (b). (JA602-603). Probation advised that Saleem's criminal history score was II, based on 2 criminal history points. (JA603-604). This resulted in an advisory range of 41 to 51 months. (JA609).

The district court replaced Saleem's counsel pursuant to an inquiry into status of counsel hearing on August 2, 2023. (JA218-278).

At the sentencing hearing on October 3, 2023 (JA296-450), Judge Whitney sustained Saleem's objection to the PSR's recommendation that the crime involved 3 to 7 firearms, deciding instead that the number of firearms was 2, eliminating the 2-point enhancement under U.S.S.G. § 2K2.1(b)(1)(A). (JA637). Pursuant to a government objection, he found that the offense involved a destructive device and added 2 points, pursuant to U.S.S.G. § 2K2.1(b)(3)(B). (JA637). He further found, and the government conceded, that Saleem did not commit the offence in connection with another felony and therefore was not subject to a 4 point enhancement under U.S.S.G. § 2K2.1(b)(6)(B). (JA637). This yielded a Total Offense Level of 17, which – with the Criminal History Category of II – generated an advisory range of 27 to 33 months. (JA637). Judge Whitney varied downward to impose a below-guidelines sentence of 18 months. (JA451-56, JA637-640).

The court entered Judgment on October 19, 2023 (JA451-456) and Saleem filed a timely Notice of Appeal on October 20, 2023. (JA457).

## SUMMARY OF THE ARGUMENT

Arbab Saleem went from being a stabbing victim in a local domestic dispute in Charlotte to a federal inmate serving 18 months because of overzealous application of a federal firearm regulation with no historical tradition connected to the era when the Second Amendment was enacted. Local authorities in Charlotte rightly dropped a domestic violence prosecution against Saleem. A year later, he was federally prosecuted for failing to register a homemade short-barreled shotgun and silencer – that were found when local authorities searched his home and car at the time of the domestic dispute – with the National Firearms Registration and Transfer Record. He was not a convicted felon and did not use the shotgun and silencer in connection with any criminal activity.

Saleem should never have been federally prosecuted because the Second Amendment protected him, his conduct, the shotgun, and the silencer – and there was no historical precedent for the regulation that required him to register these arms. The protections of the Second Amendment are unqualified and should be enforced staunchly. Under the law as recently clarified, the standard for applying the Second Amendment in the context of a regulation infringing upon it is: (1) decide

whether the plain text of the Second Amendment covers a person's conduct – is the person and arm at issue protected; and, if so, (2) the government has the burden of proving that there is some historical precedent covering the regulation; that is, the government must show that there was a regulation around 1791 (when the Second Amendment was enacted) similar to the regulation being challenged. There must be a historical tradition of regulating similar conduct.

At the first step, Saleem's short-barreled shotgun was covered by the plain text of the Second Amendment, and so was the silencer. With respect to the shotgun, similar firearms existed in the 18th Century and short-barreled shotguns are widely and legally in use today. And although silencers did not come about until the turn of the last century, over a million are registered and in legal use today, and they perform the important safety function of protecting the hearing of gun users. Although it looks like there was some concern in the 1930s that mobsters used silencers, that historical time period is irrelevant. It is nowhere near 1791 or the present. Indeed, in the present era, politicians have expressed desire to deregulate silencers for their safety benefits. Although the Second Amendment covered the arms, the government was unable to

show that there were any regulations around 1800 that required them to be registered.

Nevertheless, the district court erroneously denied a motion to dismiss the indictment and sentenced Saleem to 18 months. This Court should correct this error by vacating the conviction before Saleem serves most of his sentence. Time is of the essence because of the risk that Saleem serves his entire sentence before this Court reaches a decision. Therefore, Saleem has already requested expedited treatment of the appeal.

As an additional reason for vacating the conviction, Saleem qualifies for the Rule of Lenity. Courts have commented that the historical tradition standard imposed recently by the Supreme Court requires a doctorate-level knowledge of the history of firearms regulation. In this case, the trial court and counsel grappled at length with the issue on appeal. It is not reasonable to expect an individual like Saleem to understand whether the Second Amendment allowed him to skip registering his homemade shotgun and silencer.

## ARGUMENT

**I.    THE DISTRICT COURT ERRED BY CONCLUDING THAT THE GOVERNMENT MET ITS BURDEN OF SHOWING THAT THE SECOND AMENDMENT DID NOT PROTECT SALEEM.**

### A. Standard of Review.

This Court reviews a district court's legal conclusions in denying a motion to dismiss an indictment under a *de novo* standard. *United States v. Soriano-Jarquin*, 492 F.3d 495, 502 (4th Cir. 2007); *United States v. Good*, 326 F.3d 589, 591 (4th Cir. 2003)("We review a district court's decision to grant a motion to dismiss an indictment *de novo*.")(citation omitted). The *de novo* standard is also appropriate because this appeal presents a constitutional issue, which is a legal question. *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 312 (4th Cir. 2018)(citing *United States v. Dinkins*, 691 F.3d 358, 382 (4th Cir. 2012)).

### B. Argument.

#### 1. The Law.

Saleem's conviction of 18 months for failing to register his shotgun and silencer violates his Second Amendment right to keep and bear arms because Saleem and his firearms plainly fall within the Second Amendment's protections and, as the Supreme Court recently clarified,

11

there is no historical tradition that encompasses, directly or by analogy, the firearms at issue. *Bruen*, 597 U.S. 1; U.S. Const. amend. II.

The Second Amendment says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." This protection "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). Under *Heller*, when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct, and to justify a firearm regulation the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 17-20 (citing *Heller*); *see also McDonald v. City of Chicago*, 561 U.S. 742 (2010). After *Heller* and *McDonald* articulated this standard, the circuit courts "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Bruen*, 597 U.S. at 17. *Bruen* rejected that approach, bringing the circuit courts back into alignment with the Supreme Court's precedent in *Heller* and *McDonald. Id*.

12

The *Bruen* court wrote:

> Today, we decline to adopt that two-part approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, *the government* must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. *Only if a firearm regulation is consistent with this Nation's historical tradition* may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

(quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10, (1961)(emphasis supplied).[2] The "Second Amendment does not permit –

---

[2] Footnote 10 of *Konigsberg* offers articulate guidance regarding how to conduct the historical review required by the *Bruen* test: "[A]s Mr. Justice Holmes once said: 'The provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic living institutions transplanted from English soil. Their significance is vital not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and the line of their growth.' In this connection also compare the equally unqualified command of the Second Amendment: 'the right of the people to keep and bear Arms shall not be infringed.'" 366 U.S. at n. 10 (quoting *Gompers v. United States*, 233 U.S. 604, 610 (1914), and citing *United States v. Miller*, 307 U.S. 174)(1939)). In other words, the North Star of the analysis is that the Second Amendment is "unqualified," and commands ultimate deference as presumptively protecting an individual's right to bear arms. History and the history of regulations should be subjectively interpreted and applied in such a way as to protect the unqualified Second Amendment right absent the government's presentation of a compelling historical analogue.

let alone require – 'judges to assess the costs and benefits of firearms restrictions' under means-end scrutiny." *Heller*, 597 U.S. at 22 (quoting *McDonald*, 561 U.S. at 790-91).

Thus, the operative standard for applying the Second Amendment is simply:

At *step one*, assess whether the Second Amendment's *plain text* covers an individual's conduct – *i.e.*, is the individual at issue one of the "people" and is the firearm at issue an "arm". *Bruen*, 597 U.S. at 24. If it does, the Constitution "presumptively protects that conduct." *Id.* The Second Amendment applies, of course, to circumstances beyond what the Founders anticipated. *Id.* at 28. And, as noted, although the definition of "arms" is "fixed according to its historical understanding, that general definition covers modern instruments ***that*** ***<u>facilitate</u>*** ***armed self defense***." *Id.*

At *step two*, it is then the government's burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* A court can only conclude that the individual's conduct falls outside of Second Amendment protections if the government can meet that burden. *Id.*

14

Step one is very straightforward. The only problem with *Bruen's* test is that step two – the historical analysis – is very difficult. So difficult that its application may invoke the Rule of Lenity. *See infra*, Argument § I.B.5. As Judge Wood of the Seventh Circuit humorously but poignantly put it: the analysis upon which the test now depends "saddl[es]" the district court "with a Ph. D.- level historical inquiry that necessarily will be inconclusive." *Atkinson v. Garland*, 70 F.4th 1018, 1025 (7th Cir. 2023)(Wood, C.J., dissenting). Even the Supreme Court has acknowledged the difficulty: "To be sure, 'historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *Bruen*, 597 U.S. at 25 (quoting *McDonald*, 561 U.S. at 803-04).

Nevertheless, judges and lawyers must perform this elaborate historical inquiry – whether we have completed graduate work in American History or not – and both the Supreme Court and some circuit courts offer some guidance. Justice Thomas, for example, reminds us of our ability to employ the tool of reasoning by analogy while "history guide[s] our consideration of modern regulations that were unimaginable

at the founding." *Bruen*, 597 U.S. at 28. "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Id.* Further, "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 28-29 (citing C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)). The parties and courts must develop "metrics" for determining "which similarities are important and which are not." *Bruen*, 597 U.S. at 29. Two metrics suggested by the Supreme Court are "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29 (citing *Heller* and *McDonald*)(emphasis supplied).

Finally, the particular historical time period to which the courts analogize is important because "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 34. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* (citing *Heller*, 554 U.S. at 634-35)(emphasis in original). The Second Amendment was adopted in 1791.

16

Older or more recent history can still be relevant, but much more so when it can be demonstrated that it can be traced to relevant history at the time when the Constitution and the relevant amendment were drafted. *Bruen*, 597 U.S. at 35-36. Where a governmental practice has been generally known and broadly applied since early in the Nation's history, the practice may be particularly relevant. *Id.* at 36.

### 2. There is No Regulation in the 1791-era Historical Tradition Analogous to the National Firearms Act.

"The burden falls on the Government to 'affirmatively prove that its firearms regulation is part of the [or analogous to a] historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *United States v. Price*, 635 F. Supp. 3d 455, 464 (S.D.W. Va. Oct. 12, 2022)(quoting *Heller*, 597 U.S. at 19). The requirement that Saleem register the shotgun and silencer arises from the National Firearms Act, codified at 26 U.S.C. § 5801, *et seq.*, which was not enacted until 1934. 26 U.S.C. § 5841 (requiring registration of arms with the National Firearms Registration and Transfer Record). It does not appear that there was any wide-scale historical tradition requiring *registration* of arms before 1934 – the government has not presented anything sufficiently analogous. As a threshold matter, for this reason alone, the registration requirement

17

violates the Second Amendment and Saleem's convictions are unconstitutional.

### 3. The Short-Barreled Shotgun is an "Arm" Falling Under Second Amendment Protection, and There is No Analogous Historical Tradition of Regulations Requiring its Registration.

The conviction on the shotgun charge (Count One) should be vacated because the Second Amendment protects Saleem's conduct in possessing it, and there is no historical tradition supporting the regulation requiring its registration. First, the Second Amendment covers short-barreled shotguns.[3] Second, the government did not demonstrate that there is a historical tradition of requiring registration of short-barreled shotguns.

"[T]he Second Amendment protects the possession and use of weapons that are 'in common use[,]'" which includes short-barreled shotguns like Saleem's. *Bruen*, 597 U.S. at 21. "*Miller* said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.'" *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1993)). Firearms analogous to short-barreled shotguns

---

[3] It has not been disputed that Saleem is one of the "people" covered by the Second Amendment.

18

were widely used during the 18th century. "Short-barrel firearms, unlike modern 'assault weapons, *did* exist at the time of the Second Amendment's drafting and ratification." James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 508 (2017). It does not appear that either this Court nor the Supreme Court have expressly declined to apply Second Amendment protection to short-barreled shotguns since *Bruen*. This is important because *Bruen's* focus on historical definition of "arms" and regulations regarding specific arms requires a particular analysis that has not yet been tested in the context of the type of shotgun at issue here.

In part, this is because history instructs that short-barreled style guns were protected at the time the Second Amendment was enacted. It is also because the use and perception of short-barreled shotguns has softened in recent years, arriving at a view more akin to when they were accepted in the 18th Century. There is a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (quoting 4 Blackstone 148–149 (1769)(other citations omitted). But short-barreled shotguns "are by no means the "dangerous *and* unusual weapons" that may be restricted according to *Heller*." *Id.*

19

(emphasis supplied).[4] Similar guns were widely used in the late 1700s. And they are hardly unusual today. The ATF reports that there were 146,098 registered short-barreled shotguns in the United States as of April 2017. *See* United States Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms, *Commerce in the United States Annual Statistical Update 2017*, https://www.atf.gov/resource-center/docs/undefined/firearms-commerce-united-states-annual-statistical-update-2017/download (Mar. 10, 2024, 5:31 PM)("ATF Report"), p. 15.

_____

[4] The standard is dangerous and unusual – *both*, not one or the other. *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring)("As the per curiam opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual. Because the Court rejects the lower court's conclusion that stun guns are 'unusual,' it does not need to consider the lower court's conclusion that they are also 'dangerous.'"). In its briefing at the trial level, the government appeared to express the test in the disjunctive. (JA 93)(contending that silencers were merely dangerous). Consistently with this, the trial court's order seems to deny Second Amendment protection to short-barreled shotguns (JA181) and silencers (JA188-189) because they are merely dangerous, not dangerous and unusual. The court investigated and discussed only whether short-barreled shotguns and silencers were dangerous, not unusual. (JA188-189). To the extent that the court failed to properly apply the "dangerous and unusual" analysis, the opinion was erroneous, and the conviction should be vacated.

As further evidence that firearms analogous to short-barreled shotguns existed when the Second Amendment was enacted, a blunderbuss, which is a firearm "boasting very short barrels," existed in the 18th century and the American Revolution Institute even has "a type that was carried by British troops during the American Revolution." The American Revolution Institute, *Blunderbuss, the 'Thunder Box' of the Battlefield*,

https://www.americanrevolutioninstitute.org/recentacquisitions/english-blunderbuss/ (March 10, 2024, 4:01 PM).

Short-barreled shotguns were in common use in the 18th Century, and –as the ATF Report shows – they are in common use now. The large number of registered short-barreled shotguns shows that they are widely used for legal purposes, and Saleem certainly did not use his short-barreled shotgun in connection with any crime. Although the government's trial court briefing noted that certain Supreme Court opinions have declined to extend coverage to short-barreled shotguns, the relevant inquiry after *Bruen* is whether the government met its burden under the test that *Bruen* clarified. The government has not shown that short-barreled firearms (or guns analogous to them, like blunderbusses)

had to be universally registered around 1791. They did not. Saleem's conviction on the shotgun should be vacated.

**4. The Silencer is an "Arm" covered by the Second Amendment and there is no Analogous Historical Tradition of Regulations Requiring Registration of Silencers.**

The conviction on the silencer charge (Count Two) should be vacated because the Second Amendment protects Saleem's conduct in possessing it, and there is no historical tradition supporting the regulation requiring its registration. First, the Second Amendment covers silencers, which fall under the historical definition of "arms." Second, the government did not demonstrate that there is a historical tradition of requiring their registration. Since they are not dangerous – indeed, they promote safety for the hearing of those around the firearm – the rationale behind registration does not apply to them.

Silencers are "arms" within the historical meaning of the Second Amendment – the district court erred by concluding otherwise. (JA183-187). There are several reasons for this.

First, the government itself categorizes silencers as "firearms." The National Firearms Act makes it unlawful "to receive or possess a firearm which is not registered to him in the National Firearms Registration and

22

Transfer Record." 26 U.S.C.A. § 5861(d). "Firearm" as used in this section includes silencers. 26 U.S.C. § 5845(a)(7). Moreover, according to the criminal statute, "[t]he term 'firearm' means… any… firearm silencer." 18 U.S.C § 921(a)(3).

Second, "arms" have historically included accessories necessary or helpful to the use of a gun, or to defense, not just the gun. Citing historical dictionaries, *Heller* explained that the 18th century meaning of "arms" is "no different from the meaning today," and was very broad. In particular: "The 1773 edition of Samuel Johnson's dictionary defined 'arms' as 'weapons of offence, *or* armour *of* defence' [and] Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man *wears for his defence*, <u>*or* takes into his hands</u>, <u>*or*</u> useth in wrath *to cast at* or strike another.'" *Heller*, 554 U.S. at 581 (quoting 1 *Dictionary of the English Language* 106 (4th ed.) (reprinted 1978); 1 *A New and Complete Law Dictionary* and citing N. Webster, *American Dictionary of the English Language* (1828) (reprinted 1989))(emphasis supplied). "Arms" could be something worn, taken into hands, or used in any way for offense

or defense. This broad definition[5] surely includes a device that aids in offence by concealing the location of the gun user and aids in safer use of the firearm. And silencers are undisputedly used to "cast" bullets – the definitions above do not limit arms to devices that are *necessary* to cast bullets, and include any devices that simply do so.

At the founding, "arms" included the firearm as well as the "proper accoutrements" that rendered that firearm useful and functional. *Miller*, 307 U.S. at 182. Accoutrements during the founding included things like brushes and wires to clean the gun, holsters, and even wax to protect the firearm from rain. David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 497 (2019). Gun cleaning supplies were included, although they obviously are not necessary to fire every bullet – the gun will operate a long time without them. Like so, the gun will operate indefinitely without wax, particularly

---

[5] The Second Amendment has been found to cover even access to firing ranges and target shooting. *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."). Target shooting and firing ranges make better gun users, but they are not strictly *necessary* to make the gun operable. They are merely – as is a silencer – very helpful for safety and other reasons.

if not used in the rain. A silencer clearly falls around the same level of usefulness or better by making the gun safer for hearing and guarding against noise that could reveal the user's location to assailants.

Third, silencers unquestionably facilitate armed self-defense. *Bruen*, 597 U.S. at 28 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense."). Imagine that three intruders break into a dark home and separate throughout the home while the family is sleeping. Certainly, it would facilitate self-defense if the homeowner could shoot one intruder without making a loud noise that would disclose his location to the others intruders.

Fourth, silencers are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. In particular, as discussed below, they make firearms safer by reducing noise that creates hearing damage. This makes them so useful that legislation has been proposed to deregulate them, specifically because of their noise safety benefits. *See* Sportsmen's Heritage and Recreational Enhancement Act, H.R. 3668, 115th Cong., 1st Sess, Title XV – Hearing Protection, §§ 1501-07. The

25

sponsors of the bill presumably did not believe that silencers were dangerous.

Some history satisfies the points just made. Of course, silencers did not exist in 1791. However, they are analogous to tools making arms safer and more useful that did exist at that time. Silencers were invented around the turn of the last century. Emily Rupertus, *Suppressors: The History*, NRA Blog (Mar. 9, 2024, 5:03 PM), https://www.nrablog.com/articles/2016/10/history-of-suppressors/. The silencer, around when it was patented in 1909, was "regularly advertised in sporting goods catalogs where it was available for mail order," and "marketed to all sportsmen and intended to enhance the shooting experience by reducing the risk of hearing damage and noise pollution." *Id.* In other words, it initially served solely a sporting and safety purpose.

The original invention was "intended to reduce risk of hearing loss." *Id.* Safety is central to the silencer's function: it "can reduce the noise of a gunshot to hearing safe levels where additional hearing protection is not required to prevent permanent damage to a shooter's hearing," which "helps hunters in the field, beginners to communicate with an instructor, and ranges that may be close to neighbors or in suburban or urban areas."

26

*Id.* Theodore Roosevelt used a silencer for his early morning hunting expeditions on Long Island so that he did not wake the neighbors. *Id.*

In the district court, the government presented no evidence that, around 1791, there was any tradition of regulating arms like silencers – as discussed, tools used by civilians to make firearms safer or work better. This history is analogous to how tools facilitating safe or more functional use of civilian arms were regulated around 1791. Finally, there was no support for the notion that silencers are dangerous *and* unusual. They exist to promote hearing safety. And the ATF says there were 1,360,023 registered silencers as of April 2017 – they are not unusual at all, and widely popular for legal purposes. *See* ATF Report, p. 16. To the extent that the government argues that silencers were though to be dangerous in the 1930s, that historical reference is not helpful to the analysis, since it neither reflects views around 1791 nor today. Views change.

## 5. The Convictions Should be Vacated Because of the Rule of Lenity.

Even if the Court rejects the foregoing, it should vacate Saleem's convictions based on the Rule of Lenity. The provisions under which Saleem was prosecuted fell within the Internal Revenue Code. *United*

*States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992)(quoting *Cheek v. United States*, 498 U.S. 192, 200 (1991) ("Congress has... softened the impact of the common-law presumption [that ignorance of the law is no defense to criminal prosecution] by making specific intent to violate the law an element of certain federal criminal tax offenses")). "Making a firearm without approval may be subject to criminal sanction, as is possession of an unregistered firearm and failure to pay the tax on one." *Thompson/Ctr. Arms Co.,* 504 U.S. at 518. "It is proper, therefore, to apply the rule of lenity and resolve the ambiguity in Thompson/Center's favor." *Id.*

The current standard under *Bruen* supposes that Saleem – an ordinary citizen with no special knowledge of the history of firearm regulation over the past three centuries – should be able to make determinations about whether the Second Amendment covered his homemade arms. The government presented no evidence that he should know, or was advised, that the firearms had to be registered under the National Firearms Act. And even the trial judge found it necessary to conduct a lengthy hearing, where trained lawyers and judges grappled with historical analysis regarding regulation of silencers and short-

barreled shotguns. Given that, it is unreasonable to expect Saleem to have understood the law in this area.

## CONCLUSION

Saleem requests that the Court conclude that the Indictment violated his Second Amendment rights and vacate the Judgment.

## REQUEST FOR ORAL ARGUMENT

Oral argument is requested because it will aid the decisional process.

Respectfully submitted,

/s/ William R. Terpening
William R. Terpening
TERPENING LAW, PLLC
221 West 11th Street
Charlotte, North Carolina 28202
(980) 265-1700

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   [ X ] this brief contains [*5,664*] words.

   [   ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Century Schoolbook*]; *or*

   [   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated:  <u>March 11, 2024</u>            <u>/s/ William R. Terpening</u>
                                         *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 11th day of March, 2024 I caused this

Brief of Appellant and Joint Appendix to be filed electronically with the

Clerk of the Court using the CM/ECF System, which will send notice of

such filing to the following registered CM/ECF users:

> Amy E. Ray
> OFFICE OF THE U.S. ATTORNEY
> 100 Otis Street, Room 233
> Asheville, North Carolina  28801
> (828) 271-4661
>
> *Counsel for Appellee*

I further certify that on this 11th day of March, 2024, I caused a

copy of the Sealed Volume of the Joint Appendix to be served, on CD,

via FedEx, upon counsel for the Appellee, at the above address.

/s/ William R. Terpening
*Counsel for Appellant*